IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BIGGERS HOLDINGS LLC,<br><br>  Plaintiff,<br>           v.<br><br>JULIO GARCIA TRUST, JULIO A. GARCIA, REAL PEOPLE REALTY, INC., and DEMETRIOS T. CHRONIS,<br><br>  Defendants. | Case No. _____<br><br>**JURY DEMAND** |

# COMPLAINT

Plaintiff BIGGERS HOLDINGS LLC ("Biggers") alleges and complains against Defendants JULIO GARCIA TRUST (the "Trust"), JULIO A. GARCIA ("Garcia"), REAL PEOPLE REALTY, INC. ("Real People"), and DEMETRIOS CHRONIS ("Chronis" and, collectively with the Trust, Garcia, and Real People, "Defendants") as follows:

## NATURE OF ACTION

1. This suit arises because Defendants fraudulently induced Biggers to sign a contract to purchase a commercial property in the Lincoln Square neighborhood located at 5447-5455 North Lincoln Avenue in Chicago, Illinois (the "Property") through misstatements and omitting material facts about the results of an environmental assessment of the Property.

2. After Biggers discovered Defendants' fraud, Garcia refused to permit additional environmental testing at the Property. Instead, Garcia offered terms by which the parties could terminate the sales contract, which Biggers accepted. But Garcia has now refused to honor the parties' termination agreement and continues to tie up Biggers' earnest money.

3. Biggers states six causes of action: First, Biggers brings a claim against the Trust and Garcia for breach of the parties' termination agreement. Biggers seeks an order declaring that the

parties indeed terminated the sales contract and directing the escrow trustee to release Biggers' earnest money. Second, Biggers asserts a separate breach of contract claim against the Trust and Garcia as they failed to provide "complete" information about the Property.

4. Third, Biggers brings claims against all Defendants for common law fraud and, fourth, for violations of the Illinois Consumer Fraud and Deceptive Business Practice Act, 815 Ill. Comp. Stat. Ann. 505/1 *et seq.* (the "Consumer Fraud Act").

5. Fifth, Biggers brings claims against Real People and Chronis for violations of the Real Estate License Act, 225 Ill. Comp. Stat. Ann. 454/ 1–1 *et seq.* (the "License Act") and, sixth, for their negligent misrepresentations.

6. Each claim is based on Defendants' false statements and omissions about the Property's environmental assessment. As damages, Biggers seeks, among other things, at least ten years of the Property's stated annual revenue (i.e., $1,160,960.00).

## PARTIES

7. Plaintiff BIGGERS HOLDINGS LLC is a limited liability company organized under the laws of Indiana with its principal place of business in Indianapolis, Indiana. Biggers is a holding company for subsidiaries that purchase and operate automobile repair shops.

8. Defendant JULIO GARCIA TRUST is a land trust administered by Albany Bank and Trust Co, N.A. in Illinois. Garcia and his wife, Bonnie Garcia, are the Trust beneficiaries. On information and belief, the Property is held by the Trust.

9. Defendant JULIO A. GARCIA resides in Park Ridge, Illinois. At all relevant times, Garcia acted individually or on behalf of the Trust with actual and apparent authority.

10. Defendant REAL PEOPLE REALTY, INC. is a corporation organized under the laws of Illinois with its principal places of business in Mokena and Chicago, Illinois. Real People is listing the Property and is the principal and/or employer of Chronis.

11. Defendant DEMETRIOS CHRONIS resides in Chicago, Illinois. Chronis is a broker for Real People and listing agent for the Property. At all relevant times, Chronis acted individually or on behalf of Real People, the Trust, and/or Garcia with actual and apparent authority.

## JURISDICTION AND VENUE

12. This Court has original jurisdiction over this suit under section 1332(a)(1) of Title 28 of the United States Code (the "Judicial Code"), 28 U.S.C. § 1332(a)(1), because the parties are "citizens of different States," and "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs."

13. Venue is proper in this District under section 1391(b) of the Judicial Code, 28 U.S.C. § 1391(b), because Defendants reside in this District, all Defendants are Illinois residents, a substantial part of the events or omission giving rise to Biggers' claim occurred in this District, and the Property is located in this District.

## BACKGROUND

**A.  Biggers Reviews The Property's Marketing Brochure**

14. Garcia uses the Property for an automobile repair shop called Lincoln Automotive Group ("Lincoln Auto"). On information and belief, the Trust and Garcia urgently need to sell the Property as it has been in foreclosure since March 29, 2018, *Albany Bank and Trust Co. v. Lincoln Automotive Group, Inc.*, Case No. 2018 CH 04114 (Ill. Cir. Ct filed Mar. 29, 2018), and the proceedings are concluding.

15. As such, Chronis, through Real People, has listed and is still listing, the Property for sale on his website (cgroupre.com) and elsewhere.

16. The Property's marketing brochure, attached as **Exhibit A**, proclaims that it is an "EXCELLENT VALUE" that will provide "THOUSAND [sic] OF DOLLARS MONTHLY FROM PASSIVE INCOME," "BILBOARD [sic] ADVERTISING & RENTAL PARKING

SPACE INCOME." Also, of particular note, the first page of the brochure states in capital letters, "ENVIRONMENTAL PHASE I CLEAN," and repeats that statement later in the brochure.



17. An "Environmental Phase I," commonly referred to as a Phase I Environmental Site Assessment ("ESA") or Phase I ESA, is done to determine if the uses of a commercial property impacted soil or groundwater. A Phase I ESA that reveals environmental concerns presents potentially substantial costs for a buyer responsible for remediating hazardous environmental

conditions.[1] When a Phase I ESA is referred to as "clean," this means that an environmental professional performing the assessment has not identified environmental concerns.

18. Biggers became interested in purchasing the Property after reviewing this marketing brochure on Chronis' website. The representation in the brochure that a Phase I ESA had not identified any environmental concerns at the Property (i.e., "ENVIRONMENTAL PHASE I CLEAN") was pivotal for Biggers due to the Property's historical use as an automobile repair shop and the environmental conditions that can often arise given the nature of this type of business.

**B.     Biggers And Garcia Enter Into A Commercial Sales Contract**

19. On May 6, 2021, Biggers and Garcia entered into a Commercial Sales Contract (the "Contract") to purchase the Property. Under the Contract, the sale was scheduled to close on August 4, 2021, for a purchase price of $1,550,000. The Contract and two subsequent amendments, on May 10, 2021, and June 7, 2021, are attached as **Exhibit B**.

20. Recognizing the potential environmental hazards that exist on properties used as auto repair sites, Biggers revised the "INSPECTION/ENVIRONMENTAL SITE ASSESSMENT" section of the Contract by hand to include a representation from Garcia regarding the Phase I ESA: "Seller represents and warrants that Seller has provided a complete environmental Phase I to Buyer and that the assessments contained therein are true and complete as of the date of such Phase I report." This further shows the importance Biggers placed on the representation that the Property purportedly had a clean Phase I ESA.

21. Biggers was required under the Contract to pay an initial $300,000 in earnest money. On or about May 10, 2021, Biggers paid the earnest money to Fidelity National Title Insurance

---

[1] Standards for performing a Phase I ESA have been promulgated by the US Environmental Protection Agency and are based in part on ASTM in Standard E1527-13.

Company ("Fidelity") as the escrow trustee per the Escrow Trust Instructions Strict Joint Order #1 attached as **Exhibit C**.

22. Fidelity is still holding Biggers' earnest money.

**C.    Biggers Learns Of Chronis' And Garcia's Misrepresentations**

23. The Property's Phase I ESA did not, on its face, raise significant environmental issues. But on or about July 6, 2021, Biggers learned through the environmental professional who did the Phase I ESA (the "Inspector") that he had separately recommended to Garcia a Phase II ESA. Unknown to Biggers, the Inspector made this recommendation to Garcia before the parties entered into the Contract. In other words, the Phase I ESA was not clean, and Defendants failed to disclose complete details about the Property's environmental condition.

24. In email correspondence, Garcia asked several questions about the Phase II ESA, including "how much will phase 2 cost me?," "how long with it take. [sic]," and "[h]ow many core holes have to be drill [sic]?" These communications between Garcia and the Inspector are attached as **Exhibit D**.

25. A Phase II Environment Site Assessment, or Phase II ESA, is conducted when Phase I ESA has identified a potential environmental concern. The primary difference between Phase I and Phase II ESAs lies in the different scopes of work for the assessments. While a Phase I ESA primarily assesses the likelihood that a site is contaminated through visual observations, historical use reviews, and regulatory records, Phase II ESA considers whether contamination is, in fact, present through soil and water sampling for signs of contamination. A Phase III Environmental Site Assessment is called for only when contamination has been identified.

26. On information and belief, Chronis knew that the Property's Phase I ESA revealed environmental concerns, and Garcia had not disclosed complete information to Biggers.

**D.    Biggers and Garcia Enter Into an Agreement to Terminate the Contract**

27.   As soon as it learned of the false statement about the Phase I ESA, Biggers requested that Garcia provide access to the Property to do a Phase II ESA. The Contract, in fact, required Garcia to provide "all information relevant to the condition" of the Property and "cooperate with Buyer to secure whatever environmental site assessment" it thought "necessary or appropriate." Garcia nonetheless refused to permit access to the Property for a Phase II ESA.

28.   On the evening of Monday, July 12, 2021, Garcia sent an email to Biggers and Biggers' transactional counsel, with the heading, "Do you want to cancel purchase agreement?" In the email, Garcia reiterated that he "will not allow at this time Phase II testing." He then offered, "let's cancel the deal you get most of your money back to buy elsewhere and I get Mr. Egan's legal expenses etcetera."

29.   In an independent clause of the July 12, 2021 email, Garcia stated, "we need to deal with real estate agents and get releases or pay them from escrow." Besides not being a term of the parties' agreement, the suggestion is superfluous because, on information and belief, Real People and Chronis are entitled to payment under the terms of their listing agreement with Garcia and/or the Trust only if the Property sells.

30.   Garcia sent another email to Hicks and his counsel on the morning of Tuesday, July 13, 2021, in which he stated, "Gentlemen I am waiting on your response. Wednesday noon will be cut off time." Biggers' attorney responded shortly after, indicating that "[w]e are considering your offer" and asking "[h]ow much were your legal fees?" Garcia stated that his "[l]egal up to yesterday $24,000.00 and change."

31.   Biggers' attorney wrote back to Garcia on July 13, 2021, stating that "[w]e have decided to accept the offer and terminate and receive our [earnest money] less your attorney's fees

(if less than $25K)." He asked Garcia to have his lawyer "send me his final invoice and I will prepare a joint termination and escrow release for buyer and seller to sign." Biggers' attorney also asked Garcia to confirm: "Are you in agreement with the above?"

32. Later, on July 13, 2021, Garcia confirmed that he agreed to terminate the Contract under the terms stated in Biggers' attorney's email. Garcia said, "There will be no invoice from the lawyer, It is $25,000.00. If it is a deal put the paperwork, get it to me."

33. Despite the agreement between the parties to terminate the Contract, and even though Fidelity would require a joint statement from the parties to release Biggers' earnest money, Garcia refused to execute a Joint Earnest Money Release (the "Release") prepared by Biggers' attorney, which memorialized the terms of the parties' agreement. Thus, Biggers' money remains tied up in escrow, and he hasn't been able to use it to pursue other business opportunities.

34. The email communications setting forth the terms by which Biggers and Garcia terminated the Contract are attached as **Exhibit E** (hereafter, the "Termination Agreement").

## CAUSES OF ACTION

### COUNT I
**(Breach of Termination Agreement against the Trust and Garcia)**

35. Plaintiff realleges the facts in the paragraphs above as if set forth in this Count.

36. Garcia, individually and/or on behalf of the Trust, entered into a valid and enforceable executory agreement with Biggers under which the parties mutually agreed to terminate the Contract. The essential terms were that the parties would take the necessary steps to release to Biggers $275,000.00 of the earnest money held by Fidelity, minus escrow trustee fees, if Biggers agreed to pay Garcia $25,000.00 from that earnest money to cover his attorneys' fees.

37. While Biggers performed his contractual duties by providing the Release, Garcia breached the Termination Agreement by refusing to sign the Release or otherwise take steps to

release Biggers' earnest money from Fidelity.

38. Biggers has suffered damages in an amount to be proven at trial due to Garcia's breach, including but not limited to interest on the earnest money held in escrow and lost opportunity costs related to the funds remaining tied up.

39. Biggers further seeks (a) a declaratory judgment under sections 2201 and 2202 of the Judicial Code, 28 U.S.C. §§ 2201, 2202, and Federal Rule of Civil Procedure 57, that the Contract is terminated and (b) an order releasing the earnest money.

## COUNT II
### (Breach of Contract against the Trust and Garcia)

40. Biggers realleges the facts in the paragraphs above as if set forth in this Count.

41. The Contract included a representation and warranty by Garcia, individually and/or on behalf of the Trust, that he provided Biggers "a complete environmental Phase I … and that the assessments contained therein are true and complete."

42. The Contract also required Garcia to provide "all information relevant to the condition" of the Property and "cooperate with Buyer to secure whatever environmental site assessment" it deemed "necessary or appropriate."

43. First, Garcia breached the representation and warranty by failing to provide Biggers a "complete" Phase I ESA. In fact, Garcia intentionally withheld that the Inspector had suggested a Phase II ESA because of issues he observed in the initial environmental assessment.

44. Garcia also breached the Contract by not providing "all information relevant to the condition" of the Property and refusing to cooperate with Biggers to perform a Phase II ESA.

45. Biggers has suffered damages in an amount to be proven at trial due to Garcia's breach, including but not limited to interest on the earnest money held in escrow, lost opportunity costs related to the funds remaining tied up and attorneys' fees.

## COUNT III
**(Common Law Fraud against all Defendants)**

46. Biggers realleges the facts in the paragraphs above as if set forth in this Count.

47. Defendants made several false statements and omissions of material fact individually and/or on behalf of other Defendants, including but not limited to the Property description "Environmental Phase I Clean" used in the marketing brochure, and the representation in the Contract by Garcia that he had provided a "complete environmental Phase I." In truth, due to concerns revealed by the Phase I ESA, the Inspector suggested a Phase II ESA to do environmental sampling.

48. Defendants knew the statements were false. Email communications confirm as much.

49. On information and belief, Defendants intended to induce Biggers to rely on their false statements, namely because the primary mortgagee is foreclosing the Property. As such, the Trust and Garcia are under significant pressure to sell the Property.

50. Biggers reasonably relied on Defendants' misrepresentations as there was nothing to indicate that they were not telling the truth.

51. Biggers has suffered damages in an amount to be proven at trial due to Defendants' false statements, including but not limited to the "benefit of the bargain," which is, at the minimum, ten years of the annual revenue the Property's marketing brochures indicated that the Property would accrue (i.e., $1,160,960.00).

## COUNT IV
**(Violation of the Consumer Fraud Act against all Defendants)**

52. Biggers realleges the facts in the paragraphs above as if set forth in this Count.

53. Section 2 of the Consumer Fraud Act prohibits:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment,

suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of any trade or commerce.

815 Ill. Comp. Stat. Ann. 505/2.

54. Any person who suffers actual damage from a violation of the Consumer Fraud Act "committed by any other person may bring an action against such person." 815 Ill. Comp. Stat. Ann. 505/10a.

55. Defendants have individually and/or on behalf of other Defendants violated section 2 of the Consumer Fraud Act by misrepresenting and omitting material facts, as set forth above, in the course of conduct involving trade and commerce, namely the attempted sale of the Property.

56. Defendants intended that Biggers rely on their misrepresentation and omissions, and their deception caused Biggers to suffer damage in an amount to be proven at trial, including but not limited to the benefit of the bargain, which is, at the minimum, $1,160,960.00.

57. Defendants' conduct has caused fraud on the market generally or otherwise raises consumer protection concerns as they have posted a marketing brochure on a publicly accessible website that includes blatant misrepresentations. And, as of this date, the marketing brochure is still on Chronis' website and elsewhere on the Internet.

## COUNT V
### (Violation of the License Act against Real People and Chronis)

58. Biggers realleges the facts in the paragraphs above as if set forth in this Count.

59. Article 15 of the License Act states, in pertinent part:

Licensees shall treat all customers honestly and shall not negligently or knowingly give them false information. A licensee … shall timely disclose to customers who are prospective buyers all latent material adverse facts pertaining to the physical condition of the property that are actually known by the licensee and that could not be discovered by a reasonably diligent inspection of the property by the customer.

225 Ill. Comp. Stat. Ann. 454/15–25(a).

60. The License Act provides a private right of action for buyers misled by the sellers' broker, 225 Ill. Comp. Stat. Ann. 454/15-5(c), and further provides that, "[i]n any action brought under this Article 15, the court may, in its discretion, award … actual damages and court costs." 225 Ill. Comp. Stat. Ann. 454/15-70.

61. Biggers was a customer entitled to the protections provided in the License Act.

62. Real People and/or Chronis are "licensees" under the License Act as they hold "a valid unexpired license as a managing broker, broker, or residential leasing agent." 225 Ill. Comp. Stat. Ann. 454/1-10.

63. Chronis, acting individually and/or on behalf of Real People, treated Biggers dishonestly by negligently or knowingly (a) providing false information about the Phase I ESA for the Property and (b) failing to disclose latent material adverse facts that he knew about the physical condition of the Property. Although Chronis stated in the Property marketing brochure and elsewhere that the Phase I ESA was "clean," he knew that, in fact, the Inspector recommended a Phase II ESA due to concerns raised in his initial review.

64. Chronis did not disclose that the Inspector recommended a Phase II ESA before Biggers discovered the truth. And Biggers couldn't have discovered this information earlier by a reasonably diligent inspection of the Property.

65. Biggers has suffered damages in an amount to be proven at trial due to Chronis' violation of the License Act, including but not limited to interest on the earnest money held in escrow and lost opportunity costs related to the funds remaining tied up.

## COUNT VI
### (Negligent Misrepresentation against Real People and Chronis)

66. Biggers realleges the facts in the paragraphs above as if set forth in this Count.

67. Chronis had a duty under the License Act and common law to communicate accurate

information to Biggers.

68. Chronis, acting individually and/or on behalf of Real People, made a false statement of material fact in the Property marketing brochure when he stated the Phase I ESA was "clean." In reality, due to concerns revealed by the Phase I ESA, the Inspector suggested a Phase II ESA. Chronis omitted this material fact in the marketing brochure and otherwise.

69. Chronis knew the statements about the Property's Phase I ESA were false or, at the very least, he was careless or negligent in ascertaining the truth or falsity of those statements and not disclosing the complete information regarding the Phase I ESA to Biggers.

70. Chronis intended to induce Biggers to enter into the Contract by making false statements about the Property's Phase I ESA. And Biggers relied on these false statements in agreeing to the Contract.

71. Biggers suffered damages in an amount to be proven at trial due to Chronis' false statements, including but not limited to the benefit of the bargain, which is, at the minimum, $1,160,960.00.

WHEREFORE, Biggers respectfully prays that this Court award:

72. Compensatory damages in an amount to be proven at trial for the loss that fulfillment of the Termination Agreement would have prevented or that the breach has caused.

73. Compensatory damages in an amount to be proven at trial for the benefit of the bargain, including lost profits, which are, at a minimum, ten years of the annual revenue the Property's marketing brochures indicated that the Property would accrue (i.e., $1,160,960.00).

74. Rescission of the Contract and restoration of Biggers to its original status, including but not limited to the return of Biggers' earnest money remaining in escrow.

75. An order finding that the Contract is void *ab initio*.

76. A declaration under sections 2201 and 2202 of the Judicial Code, 28 U.S.C. §§ 2201, 2202, and Federal Rule of Civil Procedure 57 that the parties terminated the Contract, and an order that directs Fidelity to surrender all of part of Biggers' earnest money.

77. Interest on and lost opportunity costs related to the earnest money held by Fidelity.

78. Reasonable attorneys' fees and costs that Biggers incurred to perform diligence on the Property, review the Contract, and related matters.

79. Reasonable attorneys' fees and costs that Biggers incurred in bringing this lawsuit in accordance with section 13 of the Contract and section 505/10a(c) of the Act, 815 Ill. Comp. Stat. Ann. 505/10a(c).

80. Exemplary and punitive damages.

81. Pre- and post-judgment interest.

82. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

83. Biggers demands a jury trial in this action.

Dated: 1st day of September, 2021.                    Respectfully submitted,

/s/ *Nicholas A. Gowen*
Nicholas A. Gowen
Brandon R. Clark
BURKE, WARREN, MACKAY & SERRITELLA, P.C.
330 North Wabash Ave, 21st Floor
Chicago, Illinois 60611
Tel: (312) 840-7088
ngowen@burkelaw.com
bclark@burkelaw.com

Charles E. Harris, II
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 782-0600
Fax: (312) 701-7711

charris@mayerbrown.com

*Counsel for Plaintiff Biggers Holdings LLC*